**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JODI SUSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-CV-10817 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| THE PNC FINANCIAL SERVICES GROUP, | ) | |
| INC. AND AFFILIATES LONG TERM | ) | |
| DISABILITY PLAN and THE PNC | ) | |
| FINANCIAL SERVICES GROUP, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court are the parties' cross-motions for summary judgment pursuant to

Federal Rule of Civil Procedure 56(a). (R. 62, R. 66.) Plaintiff Jodi Suson seeks a declaratory

judgment that Defendant THE PNC FINANCIAL SERVICES GROUP, INC. ("PNC")

arbitrarily and capriciously denied her request for long-term disability benefits under THE PNC

FINANCIAL SERVICES GROUP, INC. AND AFFILIATES LONG TERM DISABILITY

PLAN (hereinafter "the Plan") in violation of the Employee Retirement Insurance Security Act

("ERISA"), 29 U.S.C. § 1001 *et seq.* (R. 62.) Suson also seeks statutory penalties against PNC

for its alleged failure to provide her with the trust agreement for the Plan. (R. 62.) PNC,

however, also seeks a declaratory judgment that it properly denied Suson's request for long-term

disability benefits after a full and fair review, and in accordance with ERISA. (R. 66.) PNC also

seeks a denial of Suson's request for statutory penalties. (R. 66.) For the following reasons, the

Court grants Suson's motion for summary judgment (R. 62.) in part and denies it in part. The

Court denies Defendants' motion for summary judgment (R. 66) in part and grants it in part.

## BACKGROUND

Suson is a former employee of PNC and participated in the Plan. (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 1.) PNC is the Plan Sponsor and Plan Administrator of the Plan, which is an employee welfare benefit plan governed by ERISA. (*Id.* at ¶ 3.) The Plan provides long-term disability ("LTD) benefits at 60% or 70% of participants' pre-disability eligible compensation if a participant becomes disabled and is unable to work for longer than 91 consecutive days. (R. 72, AR 836.) Liberty Life Assurance Company of Boston ("Liberty") is the Plan's claim administrator. (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 3.)

## I. The Plan

The Plan provides the following discretionary authority:

**Plan Administrator**

The Plan Administrator shall have the authority to control and manage the operation and administration of the Plan. The Plan Administrator shall have the exclusive discretionary authority to determine eligibility for benefits under the Plan, to construe the terms of the Plan and to determine any question which may arise in connection with its operation or administration, except to the extent that the Plan Administrator has authorized the claims administrator to make such determinations. Its decisions or actions in respect thereof shall be conclusive and binding upon the employer and upon and all participants and survivors, their beneficiaries, and their respective heirs, distributes executors, administrators and assignees; subject, however, to the right of the participant or survivor to file a written claim or appeal under the procedures described above. The Plan Administrator may delegate any of its duties hereunder to person or persons it may designate from time to time.

(R. 72, AR 848.)

The Plan defines the following relevant terms, in pertinent part, as follows:

**Definition of LTD**

For disabilities that extend beyond 91 consecutive calendar days and are considered long term, the definition of disability is as follows:

    - **For the first 24 months (from the date LTD benefits begin)**: you are disabled if your disability makes you unable to perform the material or essential duties of your own occupation as it is normally performed in the national economy.

    - **After you have been disabled for 24 months:** you are disabled if your disability makes you unable to perform the material duties of any occupation for which you are or can become qualified to perform by education, training or experience.

(R. 72, AR 837.)

**Claims**

Claims for benefits under the Plan must be submitted in writing to the claims administrator.  If your claim is wholly or partially denied, written or electronic notice of the decision shall be furnished within a reasonable period of time, but not later than 45 days after receipt of the claim by the Plan.

(*Id*, AR 847.)

**Proof of Claim**

As a condition of receiving benefits under the Plan, any person may be required to submit whatever proof the Plan Administrator may require (either directly to the Plan Administrator or to any person delegated by it.)

(*Id.*, AR 851.)

**Appeals**

If your claim for benefits under the Plan is denied, you (or your representative) may appeal the adverse benefit determination by submitting a request for review in writing to the

claims administrator within 180 days after your receipt of the written or electronic notice of denial. The Plan shall provide a review that does not afford deference to the initial adverse benefit determination that is conducted by an appropriate named fiduciary of the Plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.

If the adverse determination was based in whole or in part on a medical judgment, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment. The Plan shall identify any medical or vocation experts whose advice was obtained on behalf of the Plan in connection with the claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination. Any health care professional engaged by the Plan for purposes of consultation shall be an individual who is neither an individual who was consulted in connection with the adverse benefit determination that is the subject of the appeal, nor the subordinate of any such individual. In connection with your appeal, you are entitled to review pertinent documents and submit issues and comments in writing to the Plan. A hearing may be held in the discretion of the Plan Administrator for the purpose of making factual findings.

(*Id.*, AR 847-48.)

## II.    Factual Background

Starting on July 30, 2012, Suson worked for PNC as a Financial Specialist I. (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 7.) According to the job profile that PNC sent to Liberty, the position of Financial Specialist I required Suson to:

1.) Serve as the Branch Focal Point for PNC Investments in the branch ecosystem to cultivate and develop investment relationships by profiling customers and

providing guidance regarding choices and performing transactions or service requests as needed, 2.) Recommend a limited PNCJ [*sic*] Investment Product set resulting from analysis of customer needs in order to determine product suggestions that meet the customer's long-term objectives (recommendations/sales of Investment Product sets based on appropriate FINRA licensing status). 3.) Assist Branch Manager with Investment Goals by coaching and training staff and organizing and leading focused activities, and 4.) Perform Branch Banking duties as needed.

(*Id.* at ¶ 8.)

### A.    Suson's Medical History

Suson was diagnosed with bipolar disorder in 1996 and has received regular psychiatric treatment.  (*Id.* at ¶ 10.)  Since the late 1990s, Dr. Blaise Wolfrum has treated Suson for her bipolar disorder.  (*Id.*)  In addition, Suson has also been diagnosed with fibromyalgia and several other degenerative joint diseases for which she has received regular treatment.  (*Id.*)  In September 2009, Suson began receiving chiropractic treatment from Dr. Warren E. Wolschlager.  (*Id.* at ¶ 11.)  Suson was treated at least 22 separate times from September 3, 2009 through May 19, 2010, and reported severe pain in her mid-back, low-back, and neck.  (*Id.*)

On June 26, 2012, Suson saw her primary care physician, Dr. Stephanie Bartels.  (*Id.* at ¶ 12.)  Suson reported that she fell ten days earlier and had left hip pain, as well as right side, neck and shoulder pain.  (*Id.*)  Suson saw Dr. Bartels again on July 3, 2013, complaining of persistent neck pain since her fall.  (*Id.* at ¶ 13.)  Dr. Bartls ordered an MRI of Suson's cervical spinal cord which showed spondylosis and arthritis at multiple levels of her cervical spine.  (*Id.*)  Suson again saw Dr. Bartels on November 18, 2013 and reported that, the previous week, she was flushed, very hot, and had a spell where she could not breathe.  (*Id.* at ¶ 14.)  Dr. Bartles observed that Suson had a "flighty" affect, was not answering questions directly, and had rapid speech.  (*Id.*)  Dr. Bartels noted that Suson's symptoms could be panic attacks and that she was somewhat manic.  (*Id.*) Dr. Bartels instructed Suson to follow up with her psychiatrist.  (*Id.*)

5

Suson again saw Dr. Bartles on December 11, 2013 due to pain and swelling in her left index finger, which Suson said was difficult to bend. (*Id*. at ¶ 15.) Dr. Sharon Spak-Schreiner treated Suson and ordered an X-ray of the hand. (*Id.*) The X-ray showed narrowing of the first carpometacarpal joint spaces and mild associated sclerosis in the left index finger and mild narrowing of the DIP joint of the second finger. (*Id.*)

On December 16, 2013, Suson saw Dr. Wolfrum and reported that she could not stay focused and was yelling at her peers. (*Id.*, at ¶ 16.) Suson began a leave of absence from PNC on December 17, 2013 due to erratic behavior cause by bipolar disorder. (*Id.* at ¶ 17.) Suson applied for and began receiving short-term disability ("STD") benefits from PNC's STD plan. (*Id.*) The following week, Dr. Wolfrum completed a Behavioral Health Provider's Statement of Work Capacity and Impairment which documented depression, erratic behavior, and anxiety. (*Id.* at ¶ 18.) On December 27, 2013, Suson told Dr. Wolfrum that she continued to suffer from sleep problems and bipolar symptoms. (*Id.* at ¶ 19.)

At Dr. Wolfrum's recommendation, Suson was hospitalized at Alexian Brothers Behavioral Health Hospital on January 8, 2014 and enrolled in their partial hospitalization program. (*Id.* at ¶ 20.) Hospital notes show an initial diagnostic impression of bipolar disorder and anxiety. (*Id.*) Suson stated that she was having mixed moods of depression and mania. (*Id.*) Alexian Brothers medical notes state that Suson's speech was pressured, her mood was anxious, and her thought process was digressive. (*Id.*) The notes also reflect that she had an elevated mood and was laughing often. (*Id.*) On January 8, 2014, Suson reported that her health plan "forced her to change her behavioral health medications" and that she had experienced several deaths in her family as well as a toxic work environment in the months before her hospitalization. (*Id.* at ¶ 20.) A counselor evaluated Suson on January 10, 2014, diagnosed her

with bipolar disorder not otherwise specified, and noted a Global Assessment of Functioning ("GAF") score of 36.[1]  (*Id.*)  Dr. Raymond Gouttama treated Suson while at Alexian Brothers. (*Id.* at ¶ 22.)  Dr. Gouttama's psychiatric evaluation states:  "The patient stated that she has problems with sleep. She isolates herself, feeling hopeless and helpless, and no motivation. She has mood swings. There are times when she is depressed and crying and other times euphoric and somewhat hyper. The patient denies abusing alcohol or drugs."  (R. 72, AR 568.)  Suson was discharged to outpatient psychotherapy on January 30, 2014.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 22.)

Suson continued to receive treatment from Dr. Wolfrum.  (*Id.* at ¶ 23.)  On January 31, 2014, Dr. Wolfrum opined that Suson could return to work as early as February 3, 2014, and released her to work on that date with certain restrictions and accommodations.  (*Id.*)  In early May 2014, Dr. Wolfrum completed an updated Statement of Work Capacity and noted that Suson was unable to work due to her fibromyalgia, bipolar disorder, related anxiety, crying spells, pain when stressed, racing thoughts, and her ability to be easily distracted.  (*Id.*)

Suson left her active employment with PNC on May 2, 2014 and resumed STD leave. (*Id.* at ¶ 24.)  Liberty sent a letter dated June 29, 2014, advising Suson that her STD benefits would terminate and that her LTD elimination period would be satisfied as of July 31, 2014.  (*Id.* at ¶ 25.)   The letter also stated that Liberty would review her claim for LTD benefits and requested a disability claim form, activities questionnaire, claimant information form, claimant supplementary statement, authorization for release of information, and an attending physician statement.  (*Id.*)

---

[1] According to the American Psychiatric Association, a GAF score of 36 indicates:  **Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure or irrelevant) **OR major impairment in several areas**, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  (R. 69, Suson 56.1(a)(3) Stmt. Facts, Exh. B at p. 2.)

**B.** **Suson's Long-Term Disability Benefits claim**

Suson's last day of work for PNC occurred on June 24, 2014.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 15.)  Suson made a claim for LTD benefits on July 24, 2014, due to bipolar disorder, fibromyalgia, and depression. (*Id.*)  Suson and her medical providers supplied Liberty with her medical treatment records.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 27.)  On July 25, 2014, Suson completed a Claimant Supplementary Statement and an Activities Questionnaire. (*Id.* at ¶ 28.)  Suson indicated that she could sit for 30 minutes, stand for 15-20 minutes, and walk for no more than 60 minutes at a time.  (*Id.*)  Suson stated that problems focusing, memory loss, daily panic attacks, excessive crying spells, depression, fibromyalgia pain, sleeping spells, racing thoughts, difficulty speaking in clear sentences and excessive talking prevented her from engaging in any gainful employment.  (*Id.*)

While Suson originally based her LTD claim on psychiatric claims, on September 3, 2014, Suson reported to Liberty that her doctor had diagnosed her with fibromyalgia.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 22.)  The medical records Liberty received included:  (1) a May 2, 2014  MRI of Suson's lumbar spine that showed prominent lumbar spondylosis with multilevel disc disease and foraminal stenosis, (2) a July 8, 2013 MRI of the cervical spine showing cervical disc bulging at C3-C4, degenerative narrowing of the intervertebral disc at C4-C5 and C5-C6 with prominent osteoarthritis, and disc protrusion at C6-C7, and (3) a December 24, 2013 x-ray that showed mild degenerative changes.  (*Id.* at ¶ 33.)

The supplementary records also contained notes from Suson's primary care physician Dr. Bartels.  (*Id.* at ¶ 34.)  On May 23, 2014, Suson saw Dr. Bartles and reported that both of her hands were swollen and had been for the last month.  (*Id.*)  Suson also stated that she was experiencing excruciating pain all over her body.  (*Id.*)  Dr. Bartels assessed Suson as possibly

8

having fibromyalgia and ordered a venous arm ultrasound of the right arm, which was negative for deep vein thrombosis and otherwise unremarkable. (*Id*.) On August 26, 2014, Dr. Bartels' colleague Dr. Greg Lindsay saw Suson. (*Id.* at ¶ 35.) Suson reported to Dr. Lindsay that she had been experiencing more intense pain in her arms over the previous 3 to 4 weeks. (*Id.*) Dr. Lindsay discussed treatments but explained that they would have to work them into Suson's bipolar disorder treatments. (*Id.*)

### 1. Dr. Kathleen Seibel Psychiatric Report

Liberty consulted with Dr. Kathleen Seibel, a physician Board Certified in Psychiatry, who reviewed Suson's file and prepared a report dated August 12, 2014. (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 16.) Dr. Seibel noted that she had difficulty reading many of the medical records that Liberty had furnished for her review and that she did not speak to Dr. Wolfrum or with Suson. (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 30.) Dr. Seibel's report stated that the available records did not reasonably support any psychiatric diagnosis, despite Suson's previous diagnosis of bipolar disorder. (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶¶ 16-17.) Liberty sent Dr. Seibel's report to Dr. Wolfrum for his review and to provide any comments he wanted considered. (*Id.* at ¶ 18.) Dr. Wolfrum disagreed with Dr. Seibel's findings, gave a brief explanation of his own findings, and provided Liberty with updated medical records from an August 22, 2014 visit. (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 31.) The August 22, 2014 medical records contained notes that Suson was "not feeling well enough to work," "has panic attacks," "can't sleep well at night," "talks over others," and "not able to work." (R. 71, AR 207.) Dr. Wolfrum also included a note that Suson wrote which states that it takes her a long time to write emails or written documents because she cannot remember what she is trying to

say, that she has panic attacks every day, and that at one point her pain was so severe that she was suicidal.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 32.)

### 2.    Dr. Michael Rater Psychiatric Report

After receiving Dr. Wolfrum's response to Dr. Seibel's opinion, Liberty told Suson that it would seek another review.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶¶ 21.)  Dr. Michael Rater issued a report dated September 10, 2014.  (*Id.* at ¶ 23.)  Dr. Rater confirmed Suson's diagnosis of bipolar disorder due to her reports of pressured speech, racing thoughts, decreased need for sleep, periods of impulse buying, and periods of hyperactivity and high energy.  (*Id.*)  Dr. Rater concluded the records did not contain sufficient information regarding the occurrence of these symptoms, direct observation by the treating providers, or mental status exam information to support impairments from bipolar disorder.  (*Id.*)  Dr. Rater noted that both Suson and Wolfrum cited workplace-specific factors as reasons she could not work.  (*Id.* at ¶ 24.)  Dr. Rater did not speak to Suson.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 36.)

Dr. Rater spoke to Dr. Wolfrum on September 8, 2014.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 25.)  Dr. Wolfrum stated that Suson was unable to hold any gainful employment at the time but may be able to return to work in a couple of months.  (*Id.*)  Dr. Wolfrum, however, responded to and disagreed with Dr. Raters' findings.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 37.)  Dr. Wolfrum's written clarification stated that Suson, "has Bi-polar disorder and Fibromyalgia which results in mood swings and severe unmanageable pain."  (R. 71, AR 298.)  The clarification also stated that "[d]ue to recent circumstances and further observation, it is highly unlikely that [Suson] will be able to return to any form of employment for a minimum of 12 months."  (*Id.*)  Dr. Wolfrum noted that he referred Suson to a pain specialist, Dr. Madhu Singh, who ordered a sleep study due to "excruciating pain and extensive fatigue."  (*Id.*)

10

### 3.    Dr. Pamil Sidhu Physical Report

Liberty sent medical records to Dr. Pamil Sidhu, a physician Board Certified in Family Medicine.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 38.)  Dr. Sidhu's report, dated September 26, 2014, noted that Suson had been diagnosed with diffuse pain/fibromyalgia, bipolar disorder, and depression.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 28.)  Dr. Sidhu's report states that "[t]he claimant is a Financial Specialist function at a sedentary level of demand." (R. 78, PNC 56.1(b)(3)(C) Stmt. Facts, at ¶ 5.)  Dr. Sidhu reported that none of Suson's diagnoses were causing impairment and that "[o]bjective findings do not identify any abnormalities that would reasonably impact impairment or support restrictions."  (R. 71, AR 303.)  Dr. Sidhu stated that, although there was evidence of disc pathology, objective findings did not appear to be causing any impairment.  (*Id.*, AR 303-04.)  Dr. Sidhu also noted that the medial evidence does not support side effects from the prescribed medications.  (*Id.*, AR 304.)

### C.    Claim Determination

Liberty denied Suson's claim for LTD benefits on October 8, 2014.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 40.)  Liberty's denial letter stated that the records "do not clarify your symptoms for the consulting physician to provide a psychiatric diagnosis" and that the records "do not reasonably support that you have impairments attributable to the presence of mental illness that would preclude you from being able to carrying [*sic*] out your usual life activities, including work related activities."  (R. 71, AR 322.)  The letter further provided that the "objective findings in the available medical records do not identify any abnormalities that would reasonably impact impairment or support restrictions."  (*Id.*, AR 323.)  Liberty concluded that Suson did not meet the Plan's definition of disability and that it was required to deny her claim.

(*Id.*, AR 323.)  The letter informed Suson that she could request a review of the denial, which should include the following documentation:

> Specific restrictions from Dr. Wolschlager, Dr. Goldstein, Dr. Malmed, Dr. Wolf, Dr. Wolfrum, Dr. Boiskin, Dr. Singh, and Dr. Broit or any other treating specialist, office notes, referrals or consolations, MRIs, CT scans, X-Rays, diagnostic reports, hospital records, operative reports, a Functional Capacities Evaluation, updated medication changes or adjustments, surgical consults, injection notes, therapeutic treatments, therapy sessions, office treatment notes from June 2014 through the present (not already received); as well as any additional information which you feel will support your claim.

(*Id.*)

### D.    Suson's Appeal

Suson appealed the denial of benefits on April 6, 2015.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 42.)  The appeal letter addressed the disability claim, Suson's occupation with PNC, the medical evidence, legal arguments regarding Liberty's determination, and newly submitted evidence.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 34.)  The letter claimed that Suson "has been and remains disabled from her former occupation as a Financial Specialist I due to pain and sleep deprivation secondary to fibromyalgia, degenerative disc disease, rotator cuff tear, small fiber neuropathy, carpal tunnel syndrome, and severe obstructive sleep apnea, as well as interference from psychological symptoms due to bipolar disorder and depression."  (R.71, AR 385.)  Suson submitted new and additional medical records, restrictions and limitations from Suson's treating doctors, test results, documentation of medication changes, and an audio recording of Dr. Wolfrum reading his medical record notes.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 42.)  Suson's evidence relied, in part, on healthcare providers seen after Liberty denied her benefits.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 34.)

12

### 1. Suson's Additional Evidence

On October 14, 2014, Susan saw Dr. Andrew Gordon, a neurologist. (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 43; R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 34.) Dr. Gordon reviewed Suson's medical record and MRI results and noted that Suson had "significant spondylosis." (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 43.) Dr. Gordon ordered an EMG/NCS of Suson's upper and lower extremities, a skin biopsy, a neuropsychological evaluation, and various tests. (*Id.* at 43.) Skin biopsies revealed that Suson had significantly reduced Epidermal Nerve Fiber Density, consistent with small fiber neuropathy in her right leg. (*Id.* at ¶ 44.) Electromyography ("EMG") testing showed bilateral medial mononeuropathy in both wrists. (*Id.*) Suson saw Dr. Gordon on November 5, 2014, who informed Suson that the biopsies evidenced neuropathy and that the EMG showed carpal tunnel syndrome. (*Id.* ¶ 45.) Suson went to Dr. Gordon's office on November 12, 2014 due to worsening pain in her right shoulder. (*Id.* ¶ 46.) Dr. Danielle Anderson treated Suson. (*Id.*) Dr. Anderson reported that Suson had difficulty abducting and lifting her right arm. (*Id.*)

On November 13, 2014, Suson saw Dr. Jason Rotstein, an orthopedic specialist, who ordered an MRI on her right shoulder. (*Id.* at ¶ 47.) The MRI showed a "large discrete full-thickness tear rotator cuff tendon with medial retraction of the conjoined tendon" and arthritis at the common clavicular joint and the acromioclavicular joint. (*Id.* ¶ 48.) On November 18, 2014, Suson met with Dr. Rotstein who ordered a rotator cuff repair, subacromial decompression, and interscalene nerve block. (*Id.* ¶ 49.) On December 2, 2014, Suson followed up with Dr. Gordon and reported continued dysesthesia and pain in the palms of both hands. (*Id.* ¶ 50.) Suson sought treatment from Dr. Matthew Bernstein, an orthopedic specialist. (*Id.* ¶ 51.) Dr. Bernstein diagnosed Suson with carpal tunnel syndrome and trigger finger. (*Id.*) Dr. Bernstein performed

13

steroid injections into Suson's left and right carpal tunnels and both flexor digitorum profundus tendons. (*Id*.) On April 10, 2015, Suson underwent MRIs on both her right and left shoulders which confirmed the tear in her right shoulder and revealed several rotator-cuff tears in her left shoulder. (*Id.* ¶ 56.)

Dr. Aaron Malina, a neuropsychologist, completed a Neuropsychological Evaluation of Suson on October 28, 2014. (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 56; R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 34.) Dr. Malina determined that Suson's "cognition was within normal limits except for variable slowing and significant inattention." (R. 72, AR 470.) Dr. Malina stated that there was no evidence of an underlying cognitive disorder and that Suson's "cognitive concerns are instead better explained by her mood disorder, chronic pain, and untreated sleep disorder." (*Id.*)

Dr. Wolfrum completed a Mental Residual Functional Capacity Questionnaire dated December 16, 2014. (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 57.) Dr. Wolfrum listed Suson's impairments as Attention Deficit/Hyperactivity Disorder, Bipolar Disorder, and Panic Disorder. (R. 72, AR 484.) Dr. Wolfrum noted that Suson has mood fluctuations that have been depressed and irritable. (*Id.*) Dr. Wolfrum also stated that Suson's prognosis was good and that she was taking medication and responding fairly well. (*Id.*) Dr. Wolfrum did note that Suson was having some nausea as a side effect of the medication. (*Id.*) Dr. Wolfrum opined that Suson's mental ability and aptitude to perform unskilled work was insufficient to meet competitive standards in 10 categories: remembering work-like procedure, maintaining attention for two-hour segments, maintaining regular attendance and punctuality, completing a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism, responding appropriately to changes in routine, dealing with normal

14

work stress, understanding and remembering detailed instructions, carrying out detailed instructions, and dealing with stress of semi-skilled and skilled work.  (*Id.*, AR 486-87).  Dr. Wolfrum wrote that Suson has manic and irritable episodes that interfere with work and co-worker relations and that Suson is not able to focus on her work due to "thought process."  (*Id.*)  Dr. Wolfrum estimated that Suson would have to be absent from work more than four days a month due to her impairments and/or treatment of them.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 59.)

On January 2, 2015, Dr. Bartels completed a Physical Residual Functional Capacity Questionnaire.  (*Id.* at ¶ 60.)  Dr. Bartels listed Suson's impairments as fibromyalgia, small fiber neuropathy, rotator cuff tear, and carpal tunnel syndrome.  (R. 72, AR 613.)  Dr. Bartels wrote that Suson was unable to tolerate even "low stress" jobs due to severe, chronic pain.  (*Id.*, AR 614.)  Dr. Bartels opined that Suson had the ability to sit for one hour at a time and stand for fifteen minutes at a time.  (*Id.*, AR 614-15.)  Dr. Bartels also noted that Suson had significant limitations with reaching, handling, or fingering and that Suson would be unable to spend any time during a work day using her hands, fingers, or arms for grasping, turning, and twisting objects, fine manipulations, and reaching.  (*Id.*, AR 616.)  Dr. Bartels estimated that Suson would miss approximately four days per month as a result of her impairments and/or treatment.  (*Id.*)

On December 10, 2014, Suson began treatment with Dr. Michelle Kukla, a clinical psychologist, for pain management.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 52.)  On January 24, 2015, Dr. Kukla completed a Mental Residual Functional Capacity Questionnaire.  (*Id.*, at ¶ 61.)  Dr. Kukla listed Suson's possible diagnoses as bipolar disorder and post-traumatic stress disorder ("PTSD").  (R. 72, AR 508-12.)  Dr. Kukla also noted that bipolar disorder may not be the correct diagnosis.  (*Id.*, AR 508.)  Dr. Kukla listed 13 mental abilities aptitudes that can range

15

in severity from limited but satisfactory up to being unable to meet competitive work standards including:  understand and remember very short and simple instructions, carry out very short and simple instructions, maintain attention for two hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination with or proximity to others without b3eing unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in routine work setting, deal with normal work stress, understand and remember detailed instructions, and carry out detailed instructions.  (R. 72, AR 510-11).  Dr. Kukla stated that Suson's ability to function varied based on pain and sleep deprivation. (*Id.*).

Dr. Gordon completed a Neurological Medical Assessment Form, dated February 23, 2015.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 62.)  Dr. Gordon listed Suson's diagnosis as neuropathy, with continued symptoms of severe pain and numbness. (R. 71, AR 410.)  Dr. Gordon opined that Suson would not be able to perform or be exposed to: detailed or complicated tasks, close interaction with coworkers/supervisors, fast paced tasks, or exposure to work hazards.  (*Id.*, AR 411.)  Dr. Gordon stated Suson could sit for one hour at a time, and could not sit, stand, or walk for two hours or more during an eight-hour work day.  (*Id.*, AR 412).  Dr. Gordon opined Suson could spend 15% of an eight-hour workday using her fingers for fine manipulations, and less than 10% grasping, turning or twisting objects. (*Id.*, AR 413).  He estimated that Suson would miss work more than four days a month due to her impairments and treatment for such impairments.  (*Id.*)

16

Suson also submitted sworn statements from friends and neighbors.  (R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 63.)

### 2.    Dr. Klein and Dr. Panzer Joint Report

Liberty consulted with Dr. Dale Panzer, a psychiatrist, and Dr. Milton Klein, a physician Board Certified in Physical Medicine and Rehabilitation as well as in Pain Management.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 36.)  Drs. Panzer and Klein prepared a joint report, dated May 19, 2015.  (*Id.*)

Dr. Panzer spoke with Dr. Kukla on May 13, 2015.  (*Id.* at ¶ 37.)  Dr. Panzer wrote a letter to Dr. Kukla recounting their conversation.  (R. 72, AR 721.)[2]  Dr. Kukla told Dr. Panzer that Suson's "psychological condition is not leading to functional impairment."  (*Id.*)  Dr. Kukla also stated that Suson "does not have any cognitive impairment although when she is in significant pain she can feel overwhelmed and that can make it difficult for her to concentrate and focus on things."  (*Id.*)

Dr. Panzer concluded that Suson did not have a supported functionally impairing condition.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 36.) Dr. Panzer opined that Suson had no restrictions or limitations supported due to a psychiatric or psychological condition.  (*Id.* ¶ 45.) Dr. Panzer stated: "I did not find support that the claimant has interpersonal difficulty with co-workers that would constitute a significant stressor based upon the available information on file." (R. 72, AR 741-72.)  Dr. Panzer also stated that he "did not find an actual hypomanic or manic episode described in the available clinical records" and concluded that he did not support a

---

[2] Suson denies Dr. Panzer's characterizations of this conversation but does not cite to any part of the record as the basis of this denial.  "[T]he Court deems all well-supported material facts set forth in the movant's statement to be admitted unless controverted in the non-movant's statement by specific references."  *Raube v. Am. Airlines, Inc.*, 539 F. Supp. 2d 1028, 1031 (N.D. Ill. 2008) (citing *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D.Ill.2000) ("[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial."))

diagnosis of bipolar disorder. (R. 72, AR 762). Dr. Panzer found that the records supported a diagnosis of an adjustment disorder with mixed depression and anxiety. (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 41.)

Dr. Panzer spoke with Dr. Wolfrum on May 20, 2015 and prepared an addendum to his report stating that his conclusions had not changed after speaking with Dr. Wolfrum. (*Id.*, ¶¶ 46-47.) Dr. Panzer wrote a letter to Dr. Wolfrum recounting their conversation. (R. 72, AR 758.) Dr. Wolfrum told Dr. Panzer that he "did not believe the claimant had impairment in capacity to perform her activities of daily living due to a psychiatric or psychological condition." (*Id.*)

Dr. Klein addressed Suson's physical condition in the report. (*Id.* ¶ 48.) Dr. Klein stated that Suson's impairments included: small fiber neuropathy, cervical pain/lower back pain, bilateral rotator cuff tears, bilateral carpal tunnel syndrome, and bilateral thumb carpometacarpal arthritis that is more prominent on the left with right trigger thumb. (*Id.* ¶ 49.) Dr. Klein opined "within a reasonable degree of clinical probability that for the timeframe in question the claimant would be capable of maximal occasional lifting/carrying/pushing/pulling of 10 lbs, frequent lifting/carrying/pushing/pulling of 5 lbs, and sitting for six hours of an eight-hour day with 15 minute breaks at 2-4 hour intervals for standing or walking activities. The remaining two hours would be for occasional standing/walking on an occasional basis for 30–60 minutes at a time." (R. 72, AR 742).

Dr. Klein then spoke with Dr. Gordon and Dr. Bartels before drafting his report. (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 53.) Dr. Klein wrote a letter to Dr. Gordon recounting their conversation. (R. 72, AR 718.) Dr. Gordon stated that Suson would be capable of clerical or sedentary physical activities with some accommodations such as rest breaks. (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 54.) Dr. Bartels told Dr. Klein that she believed Suson would not be

18

capable of working, but said that the purpose of Suson's most recent visit with her had been for a pre-operative clearance and not to assess physical disabilities and functional limitations. (*Id.* at ¶ 55.)

### 3. Occupational Analysis

Liberty obtained the opinion of a vocational consultant who prepared an occupational analysis dated June 4, 2015. (*Id.* at ¶¶ 56-57.) The analysis indicated that Suson's job as a Financial Specialist is performed at a sedentary to light level of physical demand and that whether the occupation would require a sedentary level of functioning or a light level of functioning depends on the specific work environment. (*Id.* at ¶ 57.) The consultant reported that "[a]mple opportunities exist at both physical demand levels." (*Id.* at ¶ 58.)

### E. Appeal Determination

Liberty determined that Suson had not demonstrated she was unable to perform the material and substantial duties of her occupation under the Plan. (*Id.* at ¶ 59.) Liberty thereafter informed her of the denial of her appeal in a letter dated June 4, 2015. (*Id.*) Liberty based its determination largely on the opinions of Dr. Klein and Dr. Panzer. (R. 72, AR 782-785.) It also discussed the occupational analysis. (*Id.*, AR 785-87.)

### F. Suson's Document Request

Suson retained counsel to assist her in bringing this action after Liberty denied her appeal. (*Id.* at ¶ 62.) Suson's attorney requested "a copy of the following documents in effect as of December 17, 2013, (the date of the disability)":

- Trust Document (commonly known as the "Plan Document").

- Summary Plan Description

- Form 5500

- Any other documents or instruments under which the plan is operated.

(R. 72, AR 816-17.)  On July 13, 2015, a benefits consultant provided Suson's counsel with the Form 5500 and a copy of the summary plan description.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 65.)  The Summary Plan Description states that "[t]his booklet serves as the plan document and the summary plan description (SPD) required under ERISA."  (*Id.* at ¶ 68.)

In December 2015, counsel for the parties discussed the existence of the trust through which benefits are paid.  (*Id.* at ¶ 69.)  On January 8, 2016, Suson's counsel requested a copy of the trust agreement.  (*Id.* at ¶ 70.)  Defendants customarily include the trust agreement in the Administrative Record and ask plaintiffs' attorneys to enter into an agreement regarding confidentiality of the Administrative Record.  (*Id.* at ¶ 71.)  On January 19, 2016, PNC provided a copy of the trust agreement to Suson's counsel without requiring a confidentiality agreement. (*Id.* at ¶ 71.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of some alleged factual dispute will not defeat summary judgment."  *Bordelon v. Bd. of Educ. of the City of Chicago*, 811 F.3d 984, 989 (7th Cir. 2016) (quoting *Anderson*, 477 U.S. at 247-48).

In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The party seeking summary judgment has the burden of

establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 349 (7th Cir. 2015).

## ANALYSIS

Suson and Defendants cross-moved for summary judgment on the long-term disability termination issue and do not dispute any material facts.  Suson and PNC also cross-moved for summary judgment on the statutory penalty issue.  The Court discusses each issue in turn.

## I.    ERISA Standard of Review

"Absent special circumstances such as fraud or bad faith," ERISA plans that give the administrator discretionary authority to construe the plan's terms or determine benefit eligibility are reviewed under the arbitrary and capricious standard.  *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017) (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)).  A plan administrator's decision "may not be deemed arbitrary and capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for that decision."  *Semien*, 436 F.3d at 815 (quoting *Trombetta v. Cragin Fed. Bank for Sav. Emp. Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996)).  Under this standard, "the reviewing court must ensure only that a plan administrator's decision has rational support in the record."  *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011).

Ultimately, the Court will uphold am administrator's decision under the Plan "as long as (1) 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome,' (2) the decision 'is based on a reasonable explanation of relevant plan documents,' or

21

(3) the administrator 'has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Id.* (quoting *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)); *see also Rabinak v. United Bhd. of Carpenters Pension Fund*, 832 F.3d 750, 753 (7th Cir. 2016); *Exbom v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990).

Plaintiff alleges that Liberty abused its discretion in denying Suson's claim for LTD benefits by: improperly adding new requirements for Suson to perfect her LTD claim, unreasonably relying on the opinions of medical consultants for Suson's mental health diagnosis over those of her treating physicians or an independent psychological examination, and failing to consider relevant factors. The Court agrees in part. Liberty acted arbitrarily and by "moving the target" when it used an occupational analysis to deny Suson's appeal without any opportunity for a response. Additionally, Liberty acted arbitrarily and capriciously by failing to consider the effects of Suson's carpel tunnel syndrome.

### A.    Liberty Moved the Target With the Occupational Analysis

Plaintiff alleges that Liberty acted in an arbitrary and capricious manner when it "moved the target" by rejecting evidence on appeal that it stated was required to grant LTD benefits. ERISA requires plan administrators to provide claimants a reasonable opportunity for "a full and fair review" of the denial decision. 29 U.S.C. § 1133(2). "These requirements are designed both to allow the claimant to address the determinative issues on appeal and to ensure meaningful review of the denial." *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 396 (7th Cir. 2009) (citing *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992)). When a plan administrator invites additional evidence to establish disability and then finds that evidence insufficient under "new standards or expectations" that had not been previously communicated,

"[s]uch conduct frustrates fair claim resolution and is evidence of arbitrary and capricious behavior." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 775-76 (7th Cir. 2010) (citing *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 831 (7th Cir. 2004) (administrator unfairly imposed new, undisclosed requirements on claimant for severance benefits; an ERISA benefit "cannot be a moving target where the plan administrator continues to add conditions precedent to the award of benefits"); *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 237 (1st Cir. 2006) (awarding disability benefits where claimant "was faced with a constant shift in what he was required to show," and thus administrator's conduct was arbitrary and capricious in that it failed to consider the evidence he submitted "in an attempt to meet a moving target")).

Suson argues that Liberty moved the target in regards to her bipolar disorder claim. Liberty's initial denial letter stated that Suson's records did "not clarify your symptoms for the consulting physician to provide a psychiatric diagnosis" and that the records did "not reasonably support that you have impairments attributable to the presence of mental illness that would preclude you from being able to carrying [sic] out your usual life activities, including work related activities." (R. 71, AR 322.) The letter further stated that the "objective findings in the available medical records do not identify any abnormalities that would reasonably impact impairment or support restrictions." (*Id.*, AR 323.)

Suson argues that Liberty's medical consultant agreed Suson suffered from bipolar disorder. The record, however, reflects that Dr. Rater was reciting Dr. Wolfrum's diagnosis. (*Id.*, AR 285) ("The claimant is stated to have a diagnosis of bipolar disorder due to her reports of pressured speech, racing thoughts, decreased need for sleep and periods of impulse buying and periods of hyperactivity and high energy.") Dr. Rater stated that "there is not sufficient information as to frequency, intensity, and duration of the above symptoms and there is very

little mental status exam information or direct observation information to corroborate and extend her self description . . . ." (*Id.*)  Plaintiff also argues that, on appeal, she submitted evidence of mania, including Dr. Wolfrum's notes stating that Suson "has manic and irritable episodes" that interfere with work and co-worker relations, Dr. Bartels noting that Suson "[a]ppears to be somewhat manic," and Alexian Brothers medical notes indicated that Suson described her mood as manic.  (*Id.*, AR 485-86, 247, 516.)  This evidence, however, is self-reported, and the denial was based on the lack of other evidence that Suson's bipolar disorder created an impairment or inhibited her from working.  Additionally, Dr. Kukla, one of Suson's treating physicians, noted that bipolar disorder may not be the correct diagnosis and that Suson's symptoms varied due to lack of sleep and pain.  (*Id.*, AR 508, 510-11.)

Suson also argues that Liberty raised the necessity of showing cognitive impairment, a risk of harm to herself, and an inability to perform activities of daily living for the first time on appeal.  The initial decision letter, however, stated that the medical records did not show any impairment, stated that Suson had "intact insight and judgment and cognitive abilities," and stated that Suson did not have "impairments attributable to the presence of mental illness that would preclude you from being able to carrying [*sic*] out your usual life activities, including work related activities."  (R. 71, AR 322.)  Liberty did not act arbitrarily and capriciously by "moving the target" as to Suson's bipolar disorder claim.

Suson argues that Liberty's decision was arbitrary and capricious due to "moving the target" with respect to her physical ailments.  Suson, however, fails to say how Liberty moved the target, except in reference to Liberty finding that she could perform her occupation at a light or sedentary level of physical demand.  Suson contends that Liberty acted arbitrarily and capriciously by not giving her an opportunity to respond to the occupational analysis.  The Court

24

agrees. The occupational analysis was dated the same day as the letter denying Suson's appeal. (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶¶ 56, 59.) The use of the occupational analysis constituted "new standards or expectations" that had not been previously communicated which "frustrates fair claim resolution and is evidence of arbitrary and capricious behavior." *Holmstrom*, 615 F.3d at 775-76. Further, Suson was not given the opportunity to address "the determinative issues on appeal and . . . ensure meaningful review of the denial." *Love*, 574 F.3d at 396. Liberty acted arbitrarily and capriciously in receiving an occupational analysis and using that as a basis to deny Suson's appeal the same day, without any opportunity for Suson to respond.

### B.    Liberty Did Not Improperly Rely on File Reviewing Physicians Over Treating Physicians

Suson next argues that Liberty acted arbitrarily and capriciously in accepting the reviewing physicians' opinions over those of her treating physicians. An administrator may credit the opinions of doctors who performed a records review only, *Holmstrom*, 615 F.3d at 775 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003)), as "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians." *Kobs v. United Wis. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005). Liberty did not act arbitrarily and capriciously in relying on the opinions of file-reviewing doctors.

Suson also argues that Liberty improperly gave no explanation for relying on record-reviewing physicians over treating physicians. A plan administrator acts arbitrarily and capriciously when it selects "one opinion over another without a rational explanation." *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1088 (7th Cir. 2012). Courts, however, may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Davis v. Unum Life*

*Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006) (quoting *Nord*, 538 U.S.at 834). Liberty's letter denying Suson's appeal explained that they were basing the review on Dr. Panzer and Dr. Klein's opinions. Liberty is not required to explain why it credited other reliable evidence that conflicted with Suson's treating physicians.

Suson, however, argues that Dr. Panzer was not reliable because he ignored evidence and drew adverse inferences from the absence of that evidence. Specifically, Suson alleges that Dr. Panzer overlooked evidence of mania and evidence of impaired worker relationships. Dr. Panzer did not ignore evidence of impaired co-worker relationships. The report prepared by Dr. Panzer specifically mentioned that "Dr. Wolfrum indicated the claimant had difficulty with only one co-worker" and opined that there was not "interpersonal difficulty with co-workers that would constitute a significant stressor." (R. 72, AR 741, 742.) There is also no indication that Dr. Panzer ignored Suson's reports of talking over others preventing her from working. Dr. Panzer did not ignore evidence of impaired worker relationships, he simply disagreed that the difficulties were severe enough to cause impairment. As to ignoring evidence of mania, Dr. Panzer did not believe that the evidence was clear enough to support a manic or hyper-manic period. (R. 72, AR 735.) Even if Dr. Panzer improperly ignored evidence of mania, Dr. Kukla, one of Suson's treating physicians, noted that bipolar disorder may not be the correct diagnosis and that Suson's symptoms varied due to lack of sleep and pain. (*Id.*, AR 508, 510-11.) Suson also argues that Dr. Panzer ignored evidence of suicidal thoughts. In the past, Suson had reported feeling suicidal and having suicidal thoughts. (*Id.*, AR 36, 208, 470.) Dr. Wolfrum's Mental Residual Functional Capacity Questionnaire, however, did not list thoughts of suicide as one of Suson's symptoms. (*Id.*, AR 485.)

Liberty did not act arbitrarily or capriciously in accepting the reviewing physicians' opinions over those of her treating physicians.

### C. Consideration of Relevant Factors

Suson argues that Liberty failed to consider how Suson interacts with clients and failed to consider the effect of her carpal tunnel syndrome on computer use. A benefits determination will be upheld where the administrator "has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Edwards*, 639 F.3d at 360. Reliance on opinions that fail to consider a relevant aspect of a claimant's medical condition, however, is arbitrary. *See Krupp v. Liberty Life Assur. Co. of Boston*, 936 F. Supp. 2d 908, 915 (N.D. Ill. 2013).

According to the job profile that PNC sent to Liberty, the position of Financial Specialist I required Suson to:

> 1.) Serve as the Branch Focal Point for PNC Investments in the branch ecosystem to cultivate and develop investment relationships by profiling customers and providing guidance regarding choices and performing transactions or service requests as needed, 2.) Recommend a limited PNCJ [sic] Investment Product set resulting from analysis of customer needs in order to determine product suggestions that meet the customer's long-term objectives (recommendations/sales of Investment Product sets based on appropriate FINRA licensing status). 3.) Assist Branch Manager with Investment Goals by coaching and training staff and organizing and leading focused activities, and 4.) Perform Branch Banking duties as needed.

(R. 69, Suson 56.1(a)(3) Stmt. Facts, at ¶ 8.) The initial denial letter stated that Suson had "intact insight and judgment and cognitive abilities and there is not an indication beyond your mood report and pressured speech of signs severe enough to indicate lack of work capacity." (R. 71, AR 322.) Suson submitted evidence that her "cognition was within normal limits except for variable slowing and significant inattention." (R. 72, AR 470.) Dr. Wolfrum's Mental Residual Functional Capacity Questionnaire also stated that Suson was unable to meet competitive

standards in remembering work-like procedure and maintaining attention for two-hour segments. (*Id.*, AR 486). Dr. Panzer believed that when "[Suson's] pain condition was worse that her anxiety and reported concentration difficulty had heightened." (*Id.*, AR 741.) The record shows that Dr. Panzer considered the assertion that Suson had an inability to effectively interact with clients and prospects to cultivate and develop relationships, but found that the record did not contain sufficient evidence to support his assertion:

> I did not find support that the claimant has interpersonal difficulty with co-workers that would constitute a significant stressor based upon the available information on file. The claimant did not have sufficient lability in mood that would be expected to be functionally impairing demonstrated in the information on file. Again, it appears her mood lability was in response to her chronic pain condition waxing and waning. I did not find evidence of general interpersonal impairment. To whatever the extent the claimant has difficult with co-workers was not reflective of a mental health condition and should be considered related to her ordinary work activity. (*Id.*, AR 741-42.)

Thus, Dr. Panzer considered Suson's argument, but concluded from a medical standpoint that it lacked sufficient evidence. This does not render Liberty's conclusion arbitrary and capricious.

Liberty, however, failed to consider Suson's carpel tunnel syndrome's effect on her capacity to perform the material and essential duties of her occupation. Liberty's occupational analysis listed one of Suson's positional requirements as "**<u>Frequent</u>** handling and fingering." (R. 72, AR 774) (emphasis in original). Dr. Klein noted that Suson had "bilateral thumb carpometacarpal arthritis that is more prominent on the left with right trigger thumb." (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 49.) Dr. Klein's report did not address the effect of Suson's carpel tunnel diagnosis on the performance of the material or essential duties of her position. Suson submitted evidence that she could only spend 15% of an eight-hour workday using her fingers for fine manipulations, and less than 10% grasping, turning or twisting objects. (R. 71, AR 413.) Dr. Bartels also noted that Suson had significant limitations with reaching, handling, or fingering and that Suson would be unable to spend any time during a work day using her

28

hands, fingers, or arms for grasping, turning, and twisting objects, fine manipulations, and reaching. (R. 72, AR 616.) Dr. Gordon allegedly stated that Suson was capable of clerical/sedentary functional activities, but his report placed significant limitations on the use of her hands and fingers. (R. 71, AR 413.) Additionally, while Dr. Klein stated that Suson could work with certain restrictions, none of those restrictions were related to computer use which is directly affected by carpal tunnel syndrome. Liberty acted arbitrarily and capriciously by failing to consider the effects of Suson's carpel tunnel syndrome.

The Court grants Suson's motion for summary judgment (R. 62) in part on the basis that Liberty acted arbitrarily and capriciously in receiving an occupational analysis and using that as a basis to deny Suson's appeal the same day, without any opportunity for Suson to respond, and in failing to consider the effects of her carpel tunnel syndrome. The Court denies Defendants' motion for summary judgment (R. 66) in part on the basis that Liberty acted arbitrarily and capriciously.

## II.    Statutory Penalties

Suson also contends that she is entitled to statutory penalties due to PNC's failure to produce a plan-related document upon request. Pursuant to ERISA §1024(b)(4), "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). The purpose of the disclosure provision is to enable a participant to know where they stand by having "the information necessary to determine one's eligibility for benefits under the plan, . . . , to understand one's rights under the plan, . . . , to identify the persons to whom management of plan funds has been entrusted, . . . , and to

ascertain the procedures one must follow in order to obtain benefits." *Mondry v. Am. Family Mut. Ins. Co.*, 557 F.3d 781, 793 (7th Cir. 2009).

A plan administrator may be liable for up to $110 per day for failing to comply with a valid request for plan information. *See* 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1. For courts to impose penalties, an administrator must have failed to timely send the documents in response to a valid request and the documents requested must fall within the scope of the statute. *Huss v. IBM Med. & Dental Plan*, 418 F. App'x 498, 508-09 (7th Cir. 2011) (citing 29 U.S.C. § 1024(b)(4); *Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.2d 618, 622 (7th Cir.1987); *Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 758-59 (7th Cir.1999) ("If it had meant to require production of all documents relevant to a plan, Congress could have said so.")). Courts consider several factors in determining whether a fine is appropriate including "prejudice to the participant caused by the delay . . . ; injury to the participant . . . ; the number of requests made by the participant . . . ; the administrator's bad faith or egregious conduct . . . ; the length of and explanation for the delay . . . ; the administrators' lack of resources to comply with the request . . . ; the nature of the documents withheld . . . ; and particular combinations of these factors." *Huss*, 418 F. App'x at 508-09 (internal citations omitted).

On July 1, 2015, Suson's attorney requested "a copy of the following documents in effect as of December 17, 2013, (the date of the disability)":

- Trust Document (commonly known as the "Plan Document").

- Summary Plan Description

- Form 5500

- Any other documents or instruments under which the plan is operated.

30

(R. 72, AR 816-17.)  On July 13, 2015, a benefits consultant provided Suson's counsel with the Form 5500 and a copy of the summary plan description.  (R. 64, PNC 56.1(a)(3) Stmt. Facts, at ¶ 65.)  In December 2015, counsel for the parties discussed the existence of the trust through which the Plan pays benefits.  (*Id.* at ¶ 69.)  On January 8, 2016, Suson's counsel requested a copy of the trust agreement.  (*Id.* at ¶ 70.)  On January 19, 2016, PNC provided a copy of the trust agreement to Suson's counsel without requiring a confidentiality agreement.  (*Id.* at ¶ 71.)

Defendants argue that no statutory penalty is available because Suson's request for documents was unclear, the documents were timely produced, and the request was sent to the wrong individual.  A plan administrator is entitled to "clear notice" of the documents that a participant is seeking.  *Mondry v. Am. Family Mut. Ins. Co.*, 497 F. App'x 603, 608 (7th Cir. 2012) (citing *Anderson v. Flexel, Inc.*, 47 F.3d 243, 248 (7th Cir. 1995)).  Arguably the trust agreement falls under the "Trust Document (commonly known as the "Plan Document")" request or the request for "[a]ny other documents or instruments under which the plan is operated."  The other plan documents were timely provided after the initial request on July 1, 2015, and the trust agreement was provided 11 days after Suson's attorney specifically asked for it.

Even assuming *arguendo* that Suson made a clear request for the trust agreement, statutory penalties would not be appropriate as Suson has filed to identify any prejudice or injury caused by the delay.  Suson argues that her litigation strategy was prejudiced because it impaired her attorney's ability to strategize arguments.  Suson, however, was not precluded from making any claims or arguments due to a lack of information and PNC was not hiding conflicts in order to gain an advantage.  *Compare Leister v. Dovetail, Inc.*, 546 F.3d 875, 883-84 (7th Cir. 2008) (finding statutory penalties appropriate because Defendants "have tried to leverage [the failure to produce documents] into a statute of limitations defense because the unavailability of the

31

documents delayed [Plaintiff's] ascertaining her rights").  Indeed there is no conflict as Liberty determines eligibility for benefits and PNC has the obligation to pay benefits.  *See Geiger*, 845 F.3d at 364-65 ("A conflict of interest exists when, as in this case, a plan administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due.")  Statutory penalties are inappropriate where, as here, there is no indication of prejudice or bad faith.  *See Hakim v. Accenture U.S. Pension Plan*, 735 F. Supp. 2d 939, 956 (N.D. Ill. 2010); *Leister*, 546 F.3d. at 883-84.

The Court denies Suson's motion for summary judgment (R. 62) on the claim for statutory penalties.  The Court grants Defendants' motion for summary judgment (R. 66) on the claim for statutory penalties.

## III.   Remedy

When a plan administrator's benefits decision is arbitrary or capricious, the claimant's benefit status prior to the denial informs the remedy.  *Homstrom*, 615 F.3d at 778.  Where there is an initial denial of benefits, and not a termination of benefits already being received, the proper remedy "is to remand for further findings or explanations, unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."  *Id.* (quoting *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. No. 506*, 545 F.3d 555, 563 (7th Cir. 2008), abrogated on other grounds by *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010)).  In this case, it is not "clear cut" that Suson is entitled to benefits and the claim must be remanded for further findings or explanations. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003) ("The court must not substitute its own judgment for that of the administrator . . . The fact

that the plan administrator failed to provide the adequate procedures does not mean that the claimant is automatically entitled to benefits . . . .")

## CONCLUSION

For the foregoing reasons, the Court grants Suson's motion for summary judgment (R. 62) with respect to her abuse of discretion claim and denies her motion for summary judgment with respect to her statutory penalties claim. The Court denies Defendants' motion for summary judgment (R. 66) with respect to abuse of discretion and grants their motion for summary judgment with respect to statutory penalties. Liberty must address the effect of Suson's carpal tunnel syndrome on computer use as a relevant factor for her ability to perform the material or essential duties of her occupation. Suson must also have the opportunity to respond to Liberty's occupational analysis. Liberty's denial of plaintiff's claim for long-term disability benefits is vacated and remanded for further proceedings consistent with this opinion.

**DATED:** July 31, 2017

**ENTERED**

AMY J. ST. EVE
United States District Court Judge